IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WILLIAM H. PAIGE,
      Petitioner,

vs.                                    Case No.: 3:06cv389/MCR/EMT

JAMES R. McDONOUGH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (Doc. 7). Respondent filed an answer and relevant portions of the state court record (Doc. 13). Petitioner filed a reply (Doc. 18).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.      BACKGROUND AND PROCEDURAL HISTORY

      The procedural background of this case is undisputed by the parties and established by the state court record. Following a jury trial in the Circuit Court for Escambia County, Florida, on July 29, 2002, Petitioner was found guilty of one count of carjacking and one count of kidnapping (Doc. 13, Ex. A at 34–35, Exs. B, C). He was sentenced on September 17, 2002, to concurrent terms of sixty (60) years of incarceration on each count (*id.*, Ex. B at 72–77, Ex. D). On October 15, 2002, Petitioner filed a motion to correct sentence under Rule 3.800(b) of the Florida Rules of Criminal

Procedure (*id.*, Ex. B at 80–81).  The court granted the motion and amended Petitioner's sentence to sixty (60) years of incarceration on the kidnapping count and a concurrent term of thirty (30) years of incarceration on the carjacking count (*id.* at 87–93).

Petitioner appealed his conviction and sentence to the Florida First District Court of Appeal (First DCA).  The appellate court affirmed the conviction and sentence per curiam without written opinion on March 15, 2005, with the mandate issuing March 31, 2005 (Doc. 13, Ex. L).  Paige v. State, 895 So. 2d 1071 (Fla. 1st DCA Mar. 15, 2005) (Table).

On October 11, 2005, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 13, Ex. M at 1–38).  The trial court summarily denied the motion on December 19, 2005 (*id.* at 39–171).  Petitioner appealed the decision to the First DCA.  The appellate court affirmed the decision per curiam without written opinion on June 30, 2006, with the mandate issuing August 18, 2006 (*id.*, Ex. R).  Paige v. State, 935 So.2d 4 (Fla. 1st DCA June 30, 2006) (Table).

Petitioner filed the instant habeas action on September 7, 2006 (Doc. 1 at 6).  Respondent concedes that the petition was timely filed (Doc. 13 at 2).

## II.    TRIAL EVIDENCE

A summary of the trial proceedings provides a helpful context in reviewing Petitioner's claims.  Monique Wilkerson, formerly Monique Matthew, was the State's first witness.  She testified that on August 17, 2001, she arrived at her home at 1500 East Hernandez Street at 9:30 p.m. (Doc. 13, Ex. B at 98–99).  She observed a man standing at the front door of her home (*id.* at 100).  Ms. Wilkerson walked halfway up the yard and asked the man, who she had never seen before, if he needed help (*id.*).  The man asked her if a certain person lived there, and Ms. Wilkerson responded no (*id.*).  The porch light was on, and Ms. Wilkerson was approximately 15 feet from the man (*id.*).  Ms. Wilkerson then started to walk to another entrance to the house, and she observed the man begin to walk down the walkway from the front door (*id.*).  Ms. Wilkerson walked around the house to the side entrance, but before she got to the door, the man grabbed her, pushed and tackled her, and grabbed her purse (*id.* at 100–01).  She testified that after he grabbed her purse, he stood a few feet away and searched her purse, taking things out and putting things in his pockets (*id.* at 101–02).  The man said, "You don't have any F'ing money, bitch.  You got to have money.  You have credit cards,

you got to have money" (*id.* at 102). He then started grabbing her again, patting her down to try to find money on her person (*id.* at 102–03). Ms. Wilkerson testified that the man was facing her, and his face was five inches from hers (*id.*). He found a five-dollar bill on her person and placed it in his pocket (*id.* at 103). Ms. Wilkerson testified that the man "started going on about the credit cards, that I had money," but she told him the cards were not credit cards, but ATM cards, and she had no money in the bank (*id.*). The man had taken her driver's license, and she asked him to leave the license but take her purse and go, but the man wouldn't leave (*id.*). The man then wanted her to leave with him in her car, and she tried to back away from him, but he grabbed her arm (*id.* at 104). She kept pulling to get away, but he pulled out a knife and held it to her face (*id.*). She then stopped struggling and agreed to get in her car with him, but she refused to drive (*id.*). The man stood by her as she entered the passenger side of the car; he then went around to the driver's side and entered the car (*id.* at 104–05). The man had taken the car keys from her purse or her person, and he started driving away in her Isuzu Rodeo (*id.* at 105, 107). Ms. Wilkerson testified that the man did this without her permission and against her will, and she was in "complete fear" (*id.* at 105–06). She also testified that she saw him put the knife in his back pocket (*id.*). Ms. Wilkerson stated that the man drove north on 15th Avenue, turned left, turned north again, and crossed 12th Avenue on Scott Street (*id.* at 107). Ms. Wilkerson testified that she was in the car approximately two minutes and was sitting less than a foot from the man (*id.* at 109). She stated that her purse was on his lap during the drive, and she continued to look at the man's face (*id.*). She further stated that interior lights in the ceiling and side walls of the car illuminated when the car doors were opened, and she took "one last good look with the light on" before jumping out of the moving car (*id.* at 107, 109). Ms. Wilkerson said her feet and then her head hit the pavement, and she suffered scrapes on her knee and elbows (*id.* at 109, 111). She stated she landed on her left shoulder and could barely get up (*id.* at 111). She testified she could not work for two weeks (*id.*).

Ms. Wilkerson testified that the police arrived within minutes, and she described her assailant to an officer (*id.* at 110). The officer left and returned within ten minutes to take her to identify a suspect (*id.*). The officers shone a large headlight on the suspect and asked if he was her assailant (*id.*). Ms. Wilkerson testified that the suspect was wearing a white hat, and she asked the officers to remove it (*id.* at 111). She then "immediately" identified the suspect as her assailant (*id.*

at 110).  The officers then placed items on the hood of the car:  first, papers with phone numbers written on them, then a five-dollar bill, and then a Lotto ticket, all of which she recognized as her personal belongings (*id.* at 110, 118).  Ms. Wilkerson testified that the officers pulled a small Swiss Army knife out of the man's pocket, but it was not the yellow Exacto knife he used to threaten her (*id.* at 111).

Ms. Wilkerson described the man as more than 45 years old and approximately six feet tall with a "close to the head" hairstyle (*id.* at 101, 106).  She described his clothing as a short-sleeved shirt with a collar and dark blue pants (*id.* at 106).  She said that his eyes indicated that he was high, and she knew this because she is a recovering alcoholic and knows how a person looks when he is high (*id.*).  Ms. Wilkerson then made an in-court identification of Petitioner as the man who confronted her, held the knife to her, and forced her into the vehicle (*id.* at 106–07).

During the course of her testimony, Ms. Wilkerson identified two photographs as photographs of her vehicle, and the photographs were admitted into evidence without objection (*id.* at 108).  Exhibit 1 was a photograph of the exterior of the vehicle, and Exhibit 2 was a photograph of the inside (*id.*).

On cross-examination, Ms. Wilkerson testified that she had described the man to the police officer as 35 to 45 years old (*id.* at 114–15).  She testified that although the five-dollar bill and Lotto ticket did not have distinguishing marks on them, she believed they were hers based on the fact that the officers found these items on Petitioner's person with the phone numbers that were stolen from her purse (*id.* at 118).

Officer Kevin Christman testified that he received a dispatch regarding a carjacking and responded to the area of 9th Avenue and Cross Street to set up a loose perimeter to watch for a blue Isuzu Rodeo (*id.* at 120–21).  He saw a blue Isuzu Rodeo parked on Cross Street at the corner of 9th Avenue with the lights on and the engine running (*id.* at 121–22).  Officer Christman approached the vehicle and observed that no one was in or around it (*id.* at 122).  He then radioed dispatch that he found the vehicle and requested that a K-9 unit be sent (*id.*).

Carolyn Stephens, a senior crime scene investigator with the Pensacola Police Department, testified that she "lifted" thirteen fingerprints from the vehicle but only nine of them were in

sufficient condition to compare (*id.* at 124–25).  The parties stipulated that the nine fingerprints were the victim's (*id.* at 129).

Sergeant James Andrews testified that he and his partner, Lieutenant Paul Kelly, came into contact with Petitioner on Cross Street, approximately four or five blocks from where the vehicle was found (*id.* at 130–32).  He testified that Petitioner was walking at a very fast pace, almost a run, and heavily sweating (*id.* at 132).  Petitioner had his right hand behind his back, and Sergeant Andrews identified himself as a police officer and asked Petitioner to bring his right arm from behind his back (*id.* at 133).  Petitioner then fled on foot, and Sergeant Andrews pursued him on foot while Lieutenant Kelly pursued him in the police car (*id.* at 134).  Sergeant Andrews testified that Petitioner never left his sight, and he saw Petitioner make a downward throwing motion when he reached an open lot (*id.*).  Andrews recovered a piece of paper with the name Kimberly and phone numbers on it from the area where he saw Petitioner throw something, which was within fifty feet from where Petitioner was apprehended (*id.* at 135, 138).  He also recovered a Florida lottery ticket from behind the piece of paper (*id.*).  Both items were admitted into evidence, without objection, as Exhibits 4 and 5 after Sergeant Andrews identified them as the items recovered from the area where Petitioner threw them (*id.* at 135–36).  He and other officers searched the area but did not find anything except the piece of paper and the lottery ticket (*id.* at 136).  Sergeant Andrews further testified that it appeared that the items were recently left there because the items were completely dry, but the ground was wet with dew (*id.* at 137).

Lieutenant Kelly testified that after he apprehended Petitioner, he searched him and found a five-dollar bill in his pocket (*id.* at 143–44).  The five-dollar bill was admitted into evidence, without objection, as Exhibit 6 after Lieutenant Kelly identified it as the money he retrieved from Petitioner's pocket (*id.* at 144).  Lieutenant Kelly also identified two pieces of paper with telephone numbers written on them that he retrieved from Petitioner's pocket, and those items were admitted into evidence, without objection, as Exhibits 7 and 8 (*id.* at 144–45).  Lieutenant Kelly testified that the victim came to the scene and identified Petitioner as the man who attacked her (*id.* at 146).

On cross-examination, Lieutenant Kelly testified that he also found a Swiss Army knife in Petitioner's pocket (*id.* at 147).  He stated that Ms. Wilkerson said the knife was not the same one that she had seen, and her attacker had not been wearing a white cap (*id.* at 148).  Lieutenant Kelly

also testified that Petitioner was handcuffed when Ms. Wilkerson identified him, and she was in the middle of the street during the identification, while Petitioner was on the side of the road about 20–30 feet from her (*id.* at 148–49). On redirect, Lieutenant Kelly testified that Petitioner was illuminated with a spotlight or flashlight at the time of the identification (*id.* at 149). He also testified that Ms. Wilkerson identified the items found in Petitioner's pocket as belonging to her (*id.* at 149–50).

Ms. Wilkerson then testified that Exhibits 4, 7, and 8 were the pieces of paper with her friends' telephone numbers on them that she kept in her wallet (*id.* at 150–51).

The State rested, and defense counsel made a motion for judgment of acquittal on the carjacking and kidnapping counts (*id.* at 153–55). The court took the motion under advisement (*id.* at 155).

Petitioner elected to testify in his own defense. He testified that he was fifty-two (52) years old on August 17, 2001, and he is 5'11" tall (*id.* at 161). He stated that at approximately 8:35 that evening he left his home, located on 14th Avenue between Scott and Yonge streets, to go to the American Legion on 12th Avenue and Fisher Street (*id.* at 161–62, 181). He testified he was wearing a white baseball cap, diamond stud earrings, glasses, blue jeans, and white tennis shoes (*id.* at 162). He stated that he stayed at the American Legion for thirty minutes (*id.* at 162). He stated that when the officers stopped him he was on his way to the Grand Hotel to sell some marijuana he was holding in his right hand (*id.* at 162–63). Petitioner stated he attempted to hide the marijuana behind his back, but then ran with it in his hand and threw it down when the police cornered him in the lot (*id.* at 163–64). He testified that a police car arrived and was occupied by a woman he had never seen before (*id.* at 165). He stated that he stood with a spotlight on him for five or six minutes, and then he was placed in a police car and transported to the police department (*id.* at 166–68). Petitioner testified that at the place where the police stopped him, there were other cars on the road and other people walking on the road (*id.* at 169). He testified that he did not have phone numbers in his pocket, but he had phone numbers and money in his wallet, and he had several lottery tickets, several one-dollar bills, a five-dollar bill, and a small red-handled knife in his pocket (*id.* at 170–71). On cross-examination, Petitioner testified that Lieutenant Kelly lied when he testified that he found Exhibits 7 and 8, pieces of paper with phone numbers of Lynn and Terese,

in his pocket (*id.* at 171–72, 174).  Petitioner also denied that he threw a piece of paper and a lottery ticket on the ground (*id.* at 175).  Petitioner testified he was wearing a brown, short-sleeved polo shirt with a collar on the night in question (*id.* at 178–79).

The defense rested its case, the parties made closing arguments, and the jury was instructed by the court (*id.* at 185–98, Ex. C at 200–33).  After the jury deliberated for fifty (50) minutes, they returned their verdicts of guilty of carjacking and kidnapping (*id.* at 235–36).

III.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States."  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254 now provides:

(d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

    (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1] The appropriate test in habeas cases was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id., 529 U.S. at 412–13; Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). More recently, in Lockyer v. Andrade, 538 U.S. 63, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003), the Supreme Court instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding, the federal court should first ascertain the "clearly established Federal law," namely: "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Id., 538 U.S. at 71–72. The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in

---

[1]Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99, 120 S. Ct. at 1499–1503, 1511–16); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13, 120 S. Ct. at 1518–23). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

a formal state court proceeding.  *See* Wellington v. Moore, 314 F.3d 1256, 1260–61 (11th Cir. 2002); Robinson v. Moore, 300 F.3d 1320, 1343–45 (11th Cir. 2002).  First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication.  Wellington, 314 F.3d at 1260; Robinson, 300 F.3d at 1343.  Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law.  Wellington, 314 F.3d at 1260, Robinson, 300 F.3d at 1344.  "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent."  Wellington, 314 F.3d at 1260 (quoting Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002) (quoting Williams, 529 U.S. at 405)).  "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  Wellington, 314 F.3d at 1260 (citing and quoting Williams, 529 U.S. at 404–06).  If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority."  Fugate, 261 F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and the petitioner's case are not substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  *Id.* (citing and quoting Williams, 529 U.S. at 406).  A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the

unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Bell v. Cone, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting Williams, 529 U.S. at 411). Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." Lockyer, 538 U.S. 63. A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that [the state court] judgment is infected by constitutional error." Williams, 529 U.S. at 389. "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." Yarborough v. Alvarado, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted). Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent. Van Poyck v. Fla. Dep't of Corrections, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." § 2254(e)(1); see Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).") (dictum); Fugate, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); Parker v. Head, 244 F.3d 831, 835–36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); see also Crawford v. Head, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations). Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence. See Callahan v. Campbell, 427 F.3d

897, 926 (11th Cir. 2005) (citing § 2254(e)(1); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1308 (11th Cir. 2004) ("[Petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record.")); *see also* <u>Jones v. Walker</u>, --- F.3d at ---, No. 04-13562, 2007 WL 2376275, at *10–11 (11th Cir. Aug. 22, 2007) (holding that the AEDPA's "unreasonable determination" standard must be met by clear and convincing evidence and concluding that § 2254(d)(2) was satisfied where prisoner showed "clearly and convincingly" that state court's decision "contain[ed] an 'unreasonable determination' of fact"). If a petitioner satisfies the AEDPA, and § 2254(d)(2), the federal court must review the merits of the constitutional claim "without deferring to the state court's finding. . . ." <u>Panetti v. Quarterman</u>, --- U.S. --- 127 S. Ct. 2842, 2858, --- L. Ed. 2d --- (2007).

Only if the federal habeas court finds the state court decision to be contrary to, or an unreasonable application of, clearly established Supreme Court law does it take the final step of conducting an independent review of the merits of the petitioner's claims. <u>Panetti</u>, 127 S. Ct. at 2858 (holding that "[w]hen a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement of § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires."); <u>Jones</u>, 2007 WL 2376275, at *13. Even so, the writ still will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

## IV.   EXHAUSTION AND DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[2] thereby giving

---

[2]Section 2254 provides, in pertinent part:

(b)(1)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
      (A)  the applicant has exhausted the remedies available in the courts of the State; or
      (B) (i)  there is an absence of available State corrective process; or
        (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure,

the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has offered the following guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is insufficient to make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court.  In Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982), the habeas petitioner was granted relief on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. Id. 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)).  The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7 (internal quotation marks omitted).  The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. Id., 459 U.S. at 7 and n.3.

the question presented.

Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought.  *Id.*

Years later, the Supreme Court readdressed the "fair presentation" requirement in <u>Duncan v. Henry</u>, 513 U.S. 364.  The <u>Duncan</u> Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[3]  The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." <u>Duncan</u>, 513 U.S. at 365–66.  Recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." <u>Baldwin v. Reese</u>, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  The <u>Baldwin </u>Court commented that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*  With regard to this statement, the Eleventh Circuit stated in <u>McNair v. Campbell</u>, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"<u>McNair</u> [<u>v. Campbell</u>], 315 F. Supp. 2d at 1184 (quoting <u>Vasquez v. Hillery</u>, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . .  We therefore

---

[3]The petitioner in <u>Duncan</u> raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal.

hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[4]

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, i.e., procedurally barred from federal review. Bailey v. Nagle, 172 F.3d 1299, 1302-03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. See Coleman v. Thompson, 501 U.S. 722, 734-35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); accord Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), rev'd on other grounds, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the last state court rendering judgment clearly and expressly stated its judgment rested on a procedural bar. Id.. A federal court is not required to honor a state's procedural default ruling unless that ruling rests on adequate state grounds independent of the federal question. See Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an

---

[4]In his initial brief before the Court of Criminal Appeals, the petitioner cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. Id.

independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[5]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate.  Id.  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  Id.

To overcome a procedural default, the petitioner must show cause and prejudice or a fundamental miscarriage of justice in order for the federal habeas court to reach the merits of a claim.  Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower, 7 F.3d at 210.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

Id.

Within this framework, the court will review Petitioner's claims.

---

[5]The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

V.      PETITIONER'S CLAIMS

        Ground one:  Petitioner's convictions for carjacking and kidnapping violated the
        Double Jeopardy Clause of the Fifth Amendment (restated).

(Doc. 7 at 4, 5A–5B).  Petitioner claims that the trial court erred in denying his motion for judgment
of acquittal on the ground that his convictions for carjacking and kidnapping violated the Double
Jeopardy Clause.  Petitioner contends that the movement of the victim, the conduct upon which his
kidnapping charged was based, was merely part of the underlying felony of carjacking, and the State
failed to produce evidence that the movement of the victim had any significance independent of the
carjacking (*id*. at 5B).  Therefore, Petitioner contends, the evidence of kidnapping did not satisfy the
three-pronged test set forth in Faison v. State, 426 So. 2d 963 (Fla. 1983), and his conviction for
both crimes violates double jeopardy principles (*id*. at 5B).

        Respondent concedes that Petitioner exhausted this claim by raising it on direct appeal of his
conviction (Doc. 13 at 9).

        1.      Clearly Established Supreme Court Law

        The Double Jeopardy Clause protects a defendant from multiple punishments for the same
offense.  Missouri v. Hunter, 459 U.S. 359, 365–66, 103 S. Ct. 673, 678, 74 L. Ed. 2d 535 (1983);
North Carolina v. Pearce, 395 U.S. 711. 717, 89 S. Ct. 2072, 2076, 23 L. Ed. 2d 656 (1969),
*overruled on other grounds*, Alabama v. Smith, 490 U.S. 794, 109 S. Ct. 2201, 104 L. Ed. 2d 865
(1989).  "Where the same conduct violates two statutory provisions, the first step in the double
jeopardy analysis is to determine whether the legislature . . . intended that each violation be a
separate offense."  Garrett v. United States, 471 U.S. 773, 778, 105 S. Ct. 2407, 2411, 85 L. Ed. 2d
764 (1985)).  Although the Double Jeopardy Clause does not flatly prohibit the legislature from
punishing the same conduct under two different statutes, federal courts assume that the legislature
ordinarily does not intend to do so "'in the absence of a clear indication of contrary legislative
intent.'"  Missouri v. Hunter, 459 U.S. 359, 366, 103 S. Ct. 673, 678, 74 L. Ed. 2d 535 (1983)
(quoting Whalen v. United States, 445 U.S. 684, 691–92, 100 S. Ct. 1432, 1437–38, 63 L. Ed. 2d
715 (1980)); *see also* Garrett, 471 U.S. at 779 (holding that multiple punishments are permissible
"when the legislative intent is clear from the face of the statute or the legislative history"); Ohio v.
Johnson, 467 U.S. 493, 499 n.8, 104 S. Ct. 2536, 2541 n.8, 81 L. Ed. 2d 425 (1984) ("[I]f it is

evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end." (emphasis added)).  If no clear intention is evident, the provisions are analyzed under the "same elements" test announced in Blockburger v. United States, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932), which "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution."  United States v. Dixon, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856, 125 L. Ed. 2d 556 (1993)).  Although the court will decide under federal law whether a double jeopardy violation has occurred, it must accept the Florida courts' interpretation of the state's own statutes. Hunter, 459 U.S. at 368.

2.   Federal Review of State Court Decision

Petitioner raised this claim as his sole ground for relief in the direct appeal of his conviction (Doc. 13, Ex. G at 14–20).  The First DCA affirmed the conviction per curiam without written opinion.  Although the state court's denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable.  *See* Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326–27 (11th Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

In determining whether the state court unreasonably applied Supreme Court precedent, this court looks to the Eleventh Circuit's interpretation of the relevant Supreme Court law.  The Eleventh Circuit summarized its interpretation of the clearly established Supreme Court law as follows:

> To summarize, our review of a potential double jeopardy violation arising from a single prosecution is a two-stage analysis.  First, we ascertain whether there exists a clear legislative intent to impose cumulative punishments, under separate statutory provisions, for the same conduct.  If a clear indication of such intent exists, our inquiry is at an end and the double jeopardy bar does not apply.  If there is no clear indication of legislative intent to impose cumulative punishments, we examine the relevant statutes under the same-elements test of Blockburger.  Under that test, if each statutory offense requires proof of an element not contained in the other, the offenses are not the "same" and double jeopardy is no bar to cumulative punishment.

Williams v. Singletary, 78 F.3d 1510, 1513 (11th Cir. 1996).

The analysis of legislative intent begins by examining the language of the criminal statutes themselves.  Florida's carjacking statute, in its entirety, provides as follows:

**812.133. Carjacking**

(1) "Carjacking" means the taking of a motor vehicle which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the motor vehicle, when in the course of the taking there is the use of force, violence, assault, or putting in fear.

(2)(a) If in the course of committing the carjacking the offender carried a firearm or other deadly weapon, then the carjacking is a felony of the first degree, punishable by imprisonment for a term of years not exceeding life imprisonment or as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) If in the course of committing the carjacking the offender carried no firearm, deadly weapon, or other weapon, then the carjacking is a felony of the first degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(3)(a) An act shall be deemed "in the course of committing the carjacking" if it occurs in an attempt to commit carjacking or in flight after the attempt or commission.

(b) An act shall be deemed "in the course of the taking" if it occurs either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events.

Fla. Stat. Ann. § 812.133 (West 2000).

Florida's kidnapping statute, in its entirety, provides as follows:

**787.01. Kidnapping; kidnapping of child under age 13, aggravating circumstances**

(1)(a) The term "kidnapping" means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:

1. Hold for ransom or reward or as a shield or hostage.

2. Commit or facilitate commission of any felony.

3. Inflict bodily harm upon or to terrorize the victim or another person.

4. Interfere with the performance of any governmental or political function.

(b) Confinement of a child under the age of 13 is against her or his will within the meaning of this subsection if such confinement is without the consent of her or his parent or legal guardian.

(2) A person who kidnaps a person is guilty of a felony of the first degree, punishable by imprisonment for a term of years not exceeding life or as provided in s. 775.082, s. 775.083, or s. 775.084.

(3)(a) A person who commits the offense of kidnapping upon a child under the age of 13 and who, in the course of committing the offense, commits one or more of the following:

1. Aggravated child abuse, as defined in s. 827.03;

2. Sexual battery, as defined in chapter 794, against the child;

3. Lewd or lascivious battery, lewd or lascivious molestation, lewd or lascivious conduct, or lewd or lascivious exhibition, in violation of s. 800.04;

4. A violation of s. 796.03 or s. 796.04, relating to prostitution, upon the child; or

5. Exploitation of the child or allowing the child to be exploited, in violation of s. 450.151,

commits a life felony, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b) Pursuant to s. 775.021(4), nothing contained herein shall be construed to prohibit the imposition of separate judgments and sentences for the life felony described in paragraph (a) and for each separate offense enumerated in subparagraphs (a)1.–5.


Fla. Stat. Ann. § 787.01 (West 2000).

The language of Florida's carjacking and kidnapping statutes provides no answer to the question of whether the Florida legislature intended to punish carjacking and kidnapping as separate offenses; therefore, the court will look to Florida's rules of statutory construction.  The version of those rules in effect at the time Petitioner committed the criminal offenses provided, in relevant part:

(1)  The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused.

. . . .

(4)(a)  Whoever, in the course of one criminal transaction or episode, commits an act or acts which constitute one or more separate criminal offenses, upon conviction and adjudication of guilt, shall be sentenced separately for each criminal offense, and the sentencing judge may order the sentences to be served concurrently or consecutively. For the purposes of this subsection, offenses are separate if each offense requires proof of an element that the other does not, without regard to the accusatory pleading or the proof adduced at trial.

(b)  The intent of the Legislature is to convict and sentence for each criminal offense committed in the course of one criminal episode or transaction and not to allow the principle of lenity as set forth in subsection (1) to determine legislative intent. Exceptions to this rule of construction are:

1.  Offenses which require identical elements of proof.

2.  Offenses which are degrees of the same offense as provided by statute.

3.  Offenses which are lesser offenses the statutory elements of which are subsumed by the greater offense.

Fla. Stat. Ann. § 775.021 (West 2000).  Based upon this language, it is clear that the Florida Legislature expressly intended to convict and sentence a defendant for each offense he commits during the course of a single criminal episode, with three exceptions to that rule.  Fla. Stat. § 775.021(4)(b).  The exceptions adopt the <u>Blockburger</u> test.  *See* <u>State v. Weller</u>, 590 So. 2d 923, 925 (1991).

Regarding the third statutory exception, Florida recognizes two separate categories of lesser included offenses, "Category 1" or necessary lesser included offenses and "Category 2" or permissive lesser included offenses.  <u>In re the Use by the Trial Courts of the Standard Jury Instructions in Criminal Cases</u>, 431 So. 2d 594, 596 (Fla. 1981), *modified*, 431 So. 2d 599 (Fla. 1981).  Category 2 lesser included offenses are different from Category 1 lesser included offenses because they are not necessarily subsumed into the greater offense.  Because a Category 2 or "permissive" lesser included offense has statutory elements that are facially distinct from the greater offense, it can be subsumed into the greater offense only when the charging document and the

evidence support the additional facts needed to sustain the charge.  Weller, 590 So. 2d at 925 & n.2.
Therefore, Category 2 lesser included offenses do not form the basis of a federal double jeopardy
violation because the commission of the greater offense does not necessarily entail a conviction of
the lesser offense.  Weller, 590 So. 2d at 926;  State v. Baker, 452 So. 2d 927, 929 (Fla. 1984)
(quoted in Williams, 78 F.3d at 1514).

Initially, kidnapping is not a Category 1 or Category 2 lesser included offense of carjacking.
*See* Florida Standard Jury Instructions in Criminal Cases, Fourth Edition, Part Two:  Instructions
on Crimes, Schedule of Lesser Included Offenses (2002) (schedule adopted in 1981).  Furthermore,
analysis of the respective criminal statutes in this case shows the absence of a double jeopardy
violation as each offense requires proof of an element that the other does not.

The offense of carjacking has three statutory elements:  (1) Petitioner took the motor vehicle
from the victim, (2) force, violence, assault, or putting in fear was used in the course of the taking,
and (3) the taking was with the intent to temporarily or permanently deprive the victim of her right
to the motor vehicle or any benefit from it.   Fla. Stat. Ann. § 812.133; Florida Standard Jury
Instructions in Criminal Cases, Fourth Edition, Part Two:  Instructions on Crimes, Chapter 15.2
Carjacking (2002) (instruction adopted in 1997).  The offense of kidnapping has three statutory
elements:  (1) Petitioner forcibly or by threat confined, abducted, or imprisoned the victim against
her will, (2) Petitioner had no lawful authority, and (3) Petitioner acted with intent to commit or
facilitate commission of carjacking and/or inflict bodily harm upon or to terrorize the victim.  Fla.
Stat. Ann. § 787.011; Florida Standard Jury Instructions in Criminal Cases, Fourth Edition, Part
Two:  Instructions on Crimes, Chapter 9.1 Kidnapping (2002) (instruction adopted in 1981 and
amended in 1985).

An element of carjacking, but not kidnapping, is that Petitioner took a motor vehicle from
the person or custody of the victim.  An element of kidnapping, but not carjacking, is that Petitioner
forcibly or by threat confined, abducted, or imprisoned the victim.  Accordingly, the charges do not
become the same offense under the Blockburger test, and the Double Jeopardy Clause was not
violated.  *See* Robinson v. State, 757 So. 2d 1267 (Fla. 4th DCA (2000) (rejecting claim that
kidnapping was incident to underlying carjacking and therefore violated double jeopardy where
defendant stole a car containing a child in a car seat) (citing Faison v. State, 426 So. 2d 963, 966

(Fla. 1983); <u>Cathcart v. State</u>, 643 So. 2d 702 (Fla. 4th DCA 1994)).  Moreover, the evidence at trial clearly shows that Petitioner committed a distinct act of carjacking by taking the victim's car without her permission, which was separate from the act of confining or abducting the victim against her will, even though these acts occurred during the same criminal episode.

Petitioner has failed to show that the state court's denial of his claim was an unreasonable application of Supreme Court law.  Therefore, he is not entitled to federal habeas relief on this claim.

> B.      <u>Ground two:  The state court violated Petitioner's due process rights by</u>
> <u>failing to attach portions of the state court record in summarily denying Petitioner's</u>
> <u>Rule 3.850 motion (restated).</u>

(Doc. 7 at 4, 5B–5C).  Petitioner contends the state post-conviction court denied him due process by summarily denying his Rule 3.850 motion without attaching portions of the state court record that conclusively showed he was not entitled to relief, as required by Rule 3.850 (*id*. at 5B).

Respondent contends Petitioner's claim sets forth only a state law claim, and that claim is not meritorious under state law because the state appellate court's affirmance of the lower court's denial of Petitioner's Rule 3.850 motion constituted a determination that the lower court's attachments were adequate under state law (*see* Doc. 13 at 13–14).  Furthermore, there is no cognizable federal claim as to this issue because the Constitution does not require states to provide post-conviction procedures for criminal defendants (*id*.).

The Supreme Court has indicated that the Constitution does not require that states provide post-conviction review or any other collateral proceedings beyond direct appeal.  *See* <u>Murray v. Giarratano</u>, 492 U.S. 1, 10, 109 S. Ct. 2765, 2770, 106 L. Ed. 2d 1 (1989); <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 557, 107 S. Ct. 1990, 1994, 95 L. Ed. 2d 539 (1987); <u>United States v. MacCollom</u>, 426 U.S. 317, 322, 96 S. Ct. 2086, 2090, 48 L. Ed. 2d 666 (1976).  Correspondingly, virtually every circuit court, including the Eleventh Circuit, has ruled that errors in the process or substance of state court collateral proceedings are not cognizable on federal habeas review.  This is so, because such a claim represents an attack on a proceeding collateral to the prisoner's confinement and not the confinement itself.  *See* <u>Spradley v. Dugger</u>, 825 F.2d 1566, 1568 (11th  Cir. 1987) (per curiam) (concluding § 2254 claim that petitioner's due process rights were violated when state post-conviction court held no evidentiary hearing and failed to attach appropriate portions of record to its opinion "goes to issues unrelated to the cause of petitioner's detention [and] does not state a

basis for habeas relief"); Trevino v. Johnson, 168 F.3d 173, 180 (5th Cir. 1999); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Hassine v. Zimmerman, 160 F.3d 941, 954 (3d Cir. 1998); Montgomery v. Meloy, 90 F.3d 1200, 1206 (7th Cir. 1996); Steele v. Young, 11 F.3d 1518, 1524 (10th Cir. 1993); Williams-Bey v. Trickey, 894 F.2d 314, 317 (8th Cir. 1990); Bryant v. Maryland, 848 F.2d 492, 492 (4th Cir. 1988); Kirby v. Dutton, 794 F.2d 245, 247 (6th Cir. 1986); *but see* Dickerson v. Walsh, 750 F.2d 150, 153 (1st Cir. 1984) (noting position of other circuits on the question and concluding that federal habeas was proper avenue for attacking state post-conviction proceedings, but ultimately finding that the petitioner failed to properly exhaust his state remedies).  Thus, because Petitioner's claim does not represent a constitutional challenge to his confinement, it does not constitute grounds for habeas relief.

Furthermore, federal habeas relief is available to correct only constitutional injury.  *See* 28 U.S.C. § 2254(a); Wainwright v. Goode, 464 U.S. 78, 104 S. Ct. 378, 78 L. Ed. 2d 187 (1983); Engle v. Isaac, 456 U.S. 107, 102 S. Ct. 2976, 73 L. Ed. 2d 1361 (1981); Carrizales v. Wainwright, 699 F.2d 1053 (11th Cir. 1983).  "State courts are the ultimate expositors of state law," and federal courts must therefore abide by their rulings on matters of state law.  Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 1886, 44 L. Ed. 2d 508 (1975) (citations and footnote omitted); Carrizales, 699 F.2d at 1055.  "This limitation on federal habeas review is of equal force when a petition, which actually involves state law issues, is couched in terms of equal protection and due process."  Branan v. Booth, 861 F.2d 1507, 1508 (11th Cir. 1988) (citation omitted).

Absent an overriding constitutional concern, the manner in which the state judicial system interprets its laws is not subject to federal habeas review.  Armenia v. Dugger, 867 F.2d 1370, 1376 (11th Cir. 1989).  An overriding constitutional concern arises where the state interprets a statute in such a novel, unforeseeable way that it in essence deprives the accused of notice that his actions were criminal and therefore violates the Fourteenth Amendment.  *See* Bouie v. City of Columbia, 378 U.S. 347, 352–53, 84 S. Ct. 1697, 1702, 12 L. Ed. 2d 894 (1964).

In the instant case, although Petitioner attempts to assert his claim as a federal due process violation, he discusses the issue only with reference to state law issues.  Furthermore, the state court's interpretation of state post-conviction procedural rules does not relate to Petitioner's offense conduct, specifically, whether he was deprived of notice that his conduct was criminal.  Because

Petitioner has not alleged the existence of an overriding constitutional concern, the state courts' interpretation of state law is not subject to federal habeas review.

C.      Ground three:  Ineffective assistance of counsel based upon trial counsel's failure to "impeach" the detectives' testimony regarding impermissibly suggestive identification procedures (restated).

(Doc. 7 at 5, 5C–5E).  Petitioner contends his counsel should have impeached the police detectives with information showing that the identification procedures they used were impermissibly suggestive.  In support of his claim, Petitioner asserts that the police never asked the victim whether Petitioner's voice matched her assailant's, they never asked her to identify her assailant in a photographic or in-person line-up, and the victim never provided identifying information about her assailant's distinctive facial features, including a description of facial hair, teeth, and skin texture, or whether he was wearing jewelry (*id*. at 5C–5D).  Furthermore, Petitioner contends that the circumstances of the victim's identifying him on the night of the crime were impermissibly suggestive because the officers essentially told the victim that he was her assailant, and the victim never identified him at the scene or in court (*id*. at 5D).  Petitioner also asserts that the victim could not identify the lottery tickets or five-dollar bill as hers, nor could she identify Petitioner's knife as the knife used by her assailant (*id*. at 5D–5E).

Respondent states that although Petitioner presented this ground to the state court in his Rule 3.850 motion, the state court determined that Petitioner was merely couching a challenge to the identification procedures in the guise of an ineffective assistance of counsel claim, and such claim was procedurally defaulted because it should have been raised on direct appeal of his conviction (*see* Doc. 13, Ex. M at 39).  Therefore, Respondent contends, the issue is procedurally barred from federal review (*see* Doc. 13 at 15–17).  Furthermore, Respondent argues that the claim is without merit because Petitioner has failed to assert a colorable claim that the victim's identification of him was impermissibly suggestive (*id*. at 17–19).

Regardless of whether Petitioner fairly presented his ineffective assistance of counsel claim in the state courts, the claim is without merit.[6]  The standard for evaluating claims of ineffective

---

[6]Pursuant to 28 U.S.C. § 2254(b)(2), a claim may be denied on the merits notwithstanding the failure of the petitioner to exhaust state court remedies.

Case No: 3:06cv389/MCR/EMT

assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under Strickland, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 687–88.  It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof.  Id. at 687.  If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  Id. at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  Cf. Engle v. Isaac, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574-1575, 71 L. Ed. 2d 783 (1982).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  See Michel v. Louisiana, supra, 350 U.S. at 101, 76 S. Ct. at 164.

Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Strickland, 466 U.S. at 693.  However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96.

Additionally, to violate due process, an identification procedure used by the police must be unnecessarily suggestive and create a substantial risk of misidentification given the totality of the circumstances.  Blanco v. Singletary, 943 F.2d 1477, 1508 (11th Cir. 1991) (citing Neil v. Biggers, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)); Perez v. State, 648 So. 2d 719 (Fla. 1995) (citing Blanco v. State, 452 So. 2d 520, 524 (Fla. 1984)).  Although show-ups are widely condemned as inherently suggestive, a show-up is not invalid if it does not give rise to a substantial likelihood of irreparable misidentification.  Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987); Perez, 648 So. 2d at 719.  The factors to be considered in evaluating the likelihood of misidentification include "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty

demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."  Neil, 409 U.S. at 199.

To the extent Petitioner claims that his counsel should have questioned the victim and the officers about the reliability of the circumstances of the out-of-court identification, Petitioner has failed to show that counsel performed unreasonably.  The trial record demonstrates that defense counsel questioned the victim and Lieutenant Kelly about the fact that when the victim arrived at the location where Petitioner was being detained by police, Petitioner was handcuffed, there were two or three police officers on either side of him, more than one police car was present, officers shined a spotlight on Petitioner, and the victim was in a patrol car that was 20–30 feet from Petitioner (Doc. 13, Ex. B at 116–17, 148–49).  This defeats Petitioner's claim that defense counsel failed to impeach the witnesses' identification testimony by questioning them about the suggestive circumstances of the identification.

To the extent Petitioner claims that his counsel should have challenged the admissibility of the testimony regarding the victim's out-of-court identification, Petitioner has failed to satisfy either prong of the Strickland standard.  The victim had a good opportunity to observe her assailant when he was standing under the porch light of her home and she was approximately 15 feet from him, when he was facing her with his face five inches from hers while he patted her down to try to find money, and during the two-minute car ride when she was sitting less than a foot from him.  The victim's attention was focused on Petitioner during their interaction at her house and during the car ride; indeed, the victim testified that before she jumped out of the car, she took "one last good look with the light on."   The victim accurately described her assailant's height and clothing.  Furthermore, the victim identified her assailant only ten minutes after the crimes were completed, when her memory was still fresh, and she testified that she "immediately" recognized him as her assailant.  Because the circumstances of the victim's out-of-court identification of Petitioner indicated that the identification was reliable, Petitioner has failed to show that counsel performed unreasonably by failing to challenge the admissibility of testimony regarding the victim's identification of Petitioner on the night of the crimes on the ground that it was impermissibly suggestive.  Furthermore, Petitioner has failed to establish a reasonable probability that the trial court would have granted counsel's motion to exclude such testimony.  See Johnson, 817 F.2d at 729

(out-of-court identification was admissible, even though eyewitness was driven in patrol car to where two men had been apprehended and observed the suspects seated in the back of a patrol car, because indicia of reliability were present, namely, eyewitness had observed the robbers in broad daylight, he thoroughly described them to police, he was certain of the identification at the time, and he identified the suspects only minutes after the crime while him memory was still fresh); Perez, 648 So. 2d 719 (out-of-court and in-court identifications were admissible, even though victim was taken to view assailant where he was apprehended several miles away, because circumstances bore indicia of reliability, namely, identification was made one or two hours after assault, assault occurred in broad daylight, victim was within eight to ten feet of assailant, and victim had clear view of assailant for approximately one minute); State v. Guerra, 455 So. 2d 1046, 1048-49 (Fla. 3d DCA 1984) (out-of-court identification was admissible, even though police told victim that car matching victim's description with two occupants had been stopped, and police took victim to place where car and occupants were being detained, because circumstances bore indicia of reliability, namely, only one-half hour elapsed between robbery and identification, and victim positively identified vehicle, firearm, and driver-robber).  Additionally, the fact that the police never asked the victim whether Petitioner's voice matched her assailant's and never asked her to identify her assailant in a photographic or in-person line-up, and the victim never provided identifying information about her assailant's distinctive facial features, including a description of facial hair, teeth, and skin texture, or whether he was wearing any jewelry, does not render the victim's out-of-court identification impermissibly suggestive.  Petitioner has failed to show that his counsel had a meritorious basis for seeking exclusion of the identification testimony on the ground that the identification procedures were impermissibly suggestive; therefore, he has failed to satisfy the deficient performance prong of the Strickland standard.

Furthermore, to the extent Petitioner argues that his counsel should have elicited testimony from the officers and victim regarding the fact that the police never asked the victim whether Petitioner's voice matched her assailant's and never asked her to identify her assailant in a photographic or in-person line-up, and the victim never provided identifying information about her assailant's distinctive facial features, including a description of facial hair, teeth, and skin texture, or whether he was wearing any jewelry, Petitioner has failed to show that he was prejudiced by this

alleged error.  Defense counsel presented the fact that there was no voice recognition, photographic line-up, or in-person line-up at the police station to the jury during closing argument and argued that these facts supported the defense theory of mistaken identity (Doc. 13, Ex. B at 190–91).  While it may have been more effective to elicit this information from the victim and the officers, Petitioner has failed to establish a reasonable probability that the jury would have acquitted him if counsel had elicited this information from the witnesses in addition to presenting it in her closing argument.

As to Petitioner's claim that counsel should have challenged the trial witnesses' testimony that the lottery ticket and five-dollar bill recovered from Petitioner belonged to the victim, the trial transcript establishes that Petitioner's counsel cross-examined the victim and  Lieutenant Kelly about the fact that the five-dollar bill and Lotto ticket recovered from Petitioner did not have distinguishing marks on them that identified them as the victim's.  Furthermore, Petitioner's counsel questioned the victim about the fact that the knife she described as used by her assailant was not the same type of knife recovered from Petitioner.  Therefore, Petitioner has failed to show that counsel's cross-examination with regard to these matters was deficient.

> D.    Ground four:  Ineffective assistance of counsel based upon counsel's failure to move to strike the victim's "stereotypical" statement, "Add ten years to a black person's age because blacks don't age like others" on the ground that it was hearsay and racially prejudiced.

(Doc. 7 at 5, 5E–5F).  Petitioner asserts that the victim testified on cross-examination that her attacker was approximately 35 years old, but she added 10 years to the estimation she gave to police because she heard that black people look younger than they really are (*id*.).  Petitioner contends his counsel should have sought to strike this testimony on the ground that it contained hearsay and was based upon a racial stereotype.

Respondent concedes that Petitioner raised this claim in his Rule 3.850 motion (Doc. 13 at 19), but argues Petitioner is not entitled to federal relief because he has failed to satisfy the § 2254 standard or the Strickland standard (*id*. at 19–24).

1.    Clearly Established Supreme Court Law

The clearly established law governing claims of ineffective assistance of counsel was set forth *supra*.

2.    Federal Review of State Court Decision

Petitioner raised this claim as Ground Six in his Rule 3.850 motion (*see* Doc. 13, Ex. M at 24–26).  In the written opinion denying Petitioner's claim, the post-conviction court determined that as a matter of state law, the victim's testimony was not hearsay because it was not offered to prove the truth of the matter asserted (*id*. at 41).  Additionally, the court determined that Petitioner failed to show he was prejudiced as a result of counsel's failure to move to strike the testimony because, "although the sentiment was disturbing and inappropriate, . . . it reveals a racial prejudice of the victim," and counsel used the comment to challenge the credibility of the victim (*id*.).  The post-conviction court concluded that the Petitioner's ineffective assistance of counsel claim was without merit (*id*.).

Although the state court did not specifically identify the legal standard it employed in reviewing Petitioner's ineffective assistance of counsel claim, it cited <u>Rodriguez v. State</u>, 554 So.2d 16 (Fla. 3d DCA 1989) in rejecting another of Petitioner's ineffective assistance of counsel claims, and that case expressly employed the <u>Strickland</u> standard.  Because the state court applied the same legal standard to Petitioner's ineffective assistance of counsel claims as the Supreme Court applies to such claims, Petitioner is entitled to federal habeas relief only if he establishes that the state court decision was an unreasonable application of <u>Strickland</u>.

The trial transcript reveals the context of the victim's allegedly objectionable testimony.  During direct examination by the prosecutor, the victim stated that she knew that her assailant was "over 45" years of age (Doc. 13, Ex. B at 101).  Defense counsel cross-examined the victim regarding this statement as follows:

Q.    You stated today that you were sure the man was at least 45 years old?

A.    Uh-huh.

Q.    And that wasn't always your description, was it?

A.    It was thirty-five to forty-five when I told the police officer because I was told to add ten years to a black person.

Q.    So he actually looked like he was about 35 to you and you added the ten years because that's what you were told to do?

> A.    I don't -- I don't know.  I don't --
>
> Q.    Is my question not clear?  Okay.  What you had just told me was that you first said 35 to 45, but then someone told you to add 45 (sic) years?
>
> A.    No, not at this time.  I just learned from television that black people look younger than they are.
>
> Q.    So your original estimation was 35 to 45?
>
> A.    Uh-huh.

(*id*. at 114–15).

This court must accord deference to the state court's decision to the extent it decides the validity of Petitioner's underlying state law claim, that is, whether the victim's testimony constituted inadmissible hearsay, while reserving for federal habeas review the ultimate issue of whether the state court's decision on the ineffective assistance of counsel claim was unreasonable.  *See* Cargill v. Turpin, 120 F.3d 1366, 1381 (11th Cir. 1997) ( federal courts are not at liberty to challenge the state court's determination of state law); Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984).  Following this analysis, it is clear that the state post-conviction court held that, as a matter of state law, defense counsel had no basis to request that the testimony be stricken as hearsay because the statement was not offered to prove the truth of the matter asserted.

Additionally, the state court reasonably concluded that Petitioner failed to show he was prejudiced by the victim's voicing a racial stereotype.  As the state court noted, the victim's testimony that she based her age estimation on a racial stereotype reflected poorly on her as it exposed bias or prejudice, thus, defense counsel used this testimony to impeach the victim's credibility.  Counsel's use of this testimony to Petitioner's favor, instead of seeking to have it stricken, was not unreasonable.  Furthermore, in light of the victim's in-court and out-of-court identifications of Petitioner, there is no reasonable probability that the result of his trial would have been different if the jury had not considered the victim's admission that her estimation of her attacker's age was based upon a racial stereotype.  Therefore, Petitioner is not entitled to relief on this claim.

> F.    <u>Ground five:  Ineffective assistance of counsel based upon counsels' failure to object to the prosecutor's improper statement.</u>

(Doc. 7 at 5F–5G).  Petitioner next claims that his counsel performed ineffectively by failing to object to the prosecutor's mischaracterization of the evidence and ridiculing the defense theory (*id.*). Petitioner identifies the following statements as mischaracterizations of the evidence:  (1) the prosecutor stated that the victim testified she was confronted from behind, but the victim actually testified that Petitioner was facing her during their confrontation, (2) the prosecutor stated that Officer Christman found the victim's vehicle "at" Ninth Avenue and Cross Street, but the witness actually testified that he located the vehicle "near" Ninth Avenue and Cross Street, and (3) the prosecutor stated that detectives saw a person walking at a brisk pace from the direction of the vehicle and only three blocks away from it, but the officers actually testified that the person was four to five blocks or within a half mile of the vehicle (*id.*).

Respondent concedes that Petitioner raised this claim in his Rule 3.850 motion (Doc. 13 at 24), but argues Petitioner is not entitled to federal relief because he has failed to satisfy the § 2254 standard or the <u>Strickland</u> standard (*id.* at 24–26).

1.      Clearly Established Supreme Court Law

The clearly established law governing claims of ineffective assistance of counsel was set forth *supra*.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Two in his Rule 3.850 motion (*see* Doc. 13, Ex. M at 9–15).  In the written opinion denying Petitioner's claim, the post-conviction court found as fact that the record showed that the victim <u>did</u> testify that she was initially attacked from behind, but after that, she faced her attacker the entire time (*id.* at 40, 56).  This finding is supported by the following excerpt from the trial transcript:

> A. [by the victim].  . . . And I started to walk away to go to my back door which I used as the entrance.
> . . . .
> Q [by the prosecutor].  What did you do then?
>
> A.  I went around my house to the side entrance . . . .
>
> Q.  What did you do when you went to that side door?

> A.  I didn't make it to the door.  The man grabbed me, pushed me, tackled, grabbed by purse.
>
> . . . .
>
> Q.  When he came up behind you, what was the first thing he grabbed?
>
> A.  My purse.
>
> Q.  Was there a struggle between you and him for the purse?
>
> A.  I don't think so because he pushed me and he grabbed the purse.  Then he came back and the physical struggle happened.

(Doc. 13, Ex. B at 100–01).  The prosecutor stated during closing argument that Ms. Wilkerson "told you she was confronted from behind, that money was demanded from her.  That her purse was taken" (*id.* at 201).  This statement was not a mischaracterization of the evidence as the victim's testimony suggested that the man approached her from behind.  Therefore, Petitioner's counsel did not err by failing to object to the prosecutor's statement during closing argument.

As to the prosecutor's second comment, the state court found as fact that Officer Christman testified he found the vehicle at the intersection of Ninth and Cross (*id.* at 40, 76–77).  Again, the trial transcript supports the state court's finding:

> Q [by the prosecutor].  Where did you go then?
>
> A [by Officer Christman].  I made a U turn, came back down to Cross Street, began to travel west on Cross Street to go back to 9th and Cross, and that's when I observed a blue Rodeo on the north side of Cross Street.
>
> Q.  What period of time had elapsed from the time that you had left 9th and Cross, made contact with the other vehicle and then gotten back to 9th and Cross?
>
> A.  Twenty to thirty seconds probably.
>
> Q.  When you got back to 9th and Cross, what did you see?
>
> A.  I saw a blue Isuzu Rodeo with the lights on, engine running, it was parked along the north side of the Cross Street facing westbound.
>
> . . . .
>
> Q.  Officer Christman, can you mark here [on a map] with an X or just kind of fill in a circle here where you saw the vehicle at?
>
> A.  Yes.  Right here along the east <u>corner</u>.

Q.  And is there a house on the corner there or is that a business?

A.  It's a -- I believe it's a house that's been converted to a business.

(Doc. 13, Ex. B at 121–23) (emphasis added).  During closing argument, the prosecutor stated, "So we know that the vehicle of Ms. Wilkerson was on 9th and Cross" (*id*. at 203).  The prosecutor did not misstate the evidence by stating that the vehicle was "on 9th and Cross" because Officer Christman stated that when he returned to the intersection of 9th and Cross, he found the vehicle on the corner.  Defense counsel had no meritorious basis to object to the prosecutor's comment; therefore, Petitioner failed to demonstrate that his counsel performed deficiently by failing to object.

Regarding the prosecutor's statement that detectives saw a person walking at a brisk pace from the direction of the vehicle and only three blocks away from it, but the officers actually testified that the person was four to five blocks or within a half mile of the vehicle, the state court found as fact that the officers testified that they found Petitioner four or five blocks from the vehicle, but the prosecutor's misstatement was harmless beyond a reasonable doubt (*see* Doc. 13, Ex. M at 40).  The trial transcript shows that the prosecutor asked Sergeant Andrews how many block away from 9th and Cross did he find Petitioner, and Andrews stated, "about four or five blocks probably," "probably within a half mile" (Doc. 13, Ex. B at 132).  During closing argument, the prosecutor stated, "where they [the officers] saw the defendant was only maybe three blocks away, three to four blocks away, and was less than a half mile from where the vehicle was located" (*id*. at 203).  In light of the prosecutor's correct description of the distance as less than a half mile, it was not unreasonable for counsel to fail to object to the one-block difference between the officer's description and the prosecutor's.  Furthermore, Petitioner has failed to show a reasonable probability that the outcome of trial would have been different if the jury had been instructed to disregard the "three to four block" comment.

Finally, Petitioner's claim that the prosecutor engaged in misconduct by ridiculing the defense theory is without merit.  During closing argument, the prosecutor simply referred to Petitioner's version of the facts as unreasonable (*see* Doc. 13, Ex. C at 204–11).  This statement would be constitutionally objectionable only if it can be said that the prosecutor voiced a personal opinion that was based upon evidence that had not been presented to the jury.  United States v. Granville, 716 F.2d 819, 822 (11th Cir. 1983); United States v. Rodriguez, 585 F.2d 1234, 1243–44

(5th Cir. 1978); *see also* Jones v. State, 449 So.2d 313, 314 (Fla. 5th DCA 1984).  Here, the prosecutor's remarks clearly centered upon the evidence, including Petitioner's testimony, and the viability of Petitioner's version of the facts.  By testifying on his own behalf, Petitioner made his credibility fair game for attack.  The prosecutor's characterization of Petitioner's version of the facts and the defense theory as unreasonable was not improper.  Accordingly, the court concludes that defense counsel was not constitutionally ineffective for failing to object to the prosecutor's comments.

     F.     <u>Ground six:  Ineffective assistance of counsel based upon counsel's failure to impeach Lieutenant Kelly regarding how he apprehended Petitioner.</u>

(Doc. 7 at 5H).  Petitioner claims that his counsel should have questioned Lieutenant Kelly regarding the manner in which he apprehended Petitioner (*id.*).  Petitioner asserts that Kelly cornered him, "pinned" him, and knocked him to the ground, and counsel should have impeached the officer with these facts (*id.*).

     Respondent contends that this claim is procedurally defaulted because although Petitioner presented this claim in his Rule 3.850 motion, the state court denied the claim on state procedural grounds; therefore, Petitioner is not entitled to federal habeas review (Doc. 13 at 26).  Respondent additionally argues Petitioner is not entitled to federal relief because he has failed to satisfy the <u>Strickland</u> standard (*id.* at 26–28).

     1.     Clearly Established Supreme Court Law

     The clearly established law governing claims of ineffective assistance of counsel was set forth *supra*.

     2.     Federal Review of State Court Decision

     Petitioner raised this claim as Ground Three in his Rule 3.850 motion (*see* Doc. 13, Ex. M at 16–17).  In the written opinion denying Petitioner's claim, the post-conviction court addressed Petitioner's claim as follows:

> As with many of the Defendant's claims in this motion, he believes that since his own testimony was different, then the other witness should have been "impeached" or charged with perjury.  The Defendant provides no avenue of impeachment beyond his own version of events.  At best, this claim is insufficiently pled, and at worst it fails as a matter of law.

(Doc. 13, Ex. M at 40–41).

Initially, the fact that Lieutenant Kelly cornered and "pinned" Petitioner was presented to the jury not only in Petitioner's testimony, but in Lieutenant Kelly's testimony as well (Doc. 13, Ex. B at 142–43, 164–65). Additionally, although defense counsel did not ask Lieutenant Kelly whether he knocked Petitioner to the ground with his car door, defense counsel elicited testimony from Petitioner that Kelly, "pulled the car right in the corner where I was and he blocked me in. So I tried to come out on his side. He opened -- he slammed open the door and knocked me down on the ground" (*id*. at 165). Furthermore, defense counsel referenced the fact that the officers "took him down with a car door" in her closing argument as support for the defense theory that police rushed to judgment in identifying Petitioner as the attacker and that they essentially engaged in misconduct to frame him for the crimes (*id*. at 191). Even if the jury heard Lieutenant Kelly admit that he knocked Petitioner to the ground with his car door, there is no reasonable probability that the result of Petitioner's trial would have been different, especially in light of the fact that Petitioner admitted that Lieutenant Kelly knocked him to the ground after he attempted to leave the area where Kelly had cornered him. Petitioner failed to satisfy either prong of the <u>Strickland</u> standard; therefore, he is not entitled to federal habeas relief.

> G.    Ground seven: Ineffective assistance of counsel based upon counsel's failure
>        to object and properly preserve the denial of the suppression of evidence.

(Doc. 7 at 5I–5K). Petitioner's claim is somewhat convoluted. He first claims that his counsel failed to "properly preserve the denial of the suppression seized, resulting in a waiver of petitioner's right to appellate review of the trial court's adverse ruling," thereby suggesting that his counsel filed a motion to suppress, which was denied, but then failed to properly preserve the suppression issue for appellate review (*id*. at 5I–5J). Petitioner then appears to argue that his counsel failed to object to the admission of particular items of evidence, specifically, the lottery ticket and pieces of paper with telephone numbers on them, on the ground that the items were illegally seized (*id*. at 5I). Petitioner then argues that his counsel should have objected to admission of the items on the ground that they were not properly authenticated or identified as the victim's (*id*. at 5I–5J).

Respondent concedes that this claim was presented to the state courts in Petitioner's Rule 3.850 motion (*see* Doc. 13 at 29).

> 1.    Clearly Established Supreme Court Law

The clearly established law governing claims of ineffective assistance of counsel was set forth *supra*.

### 2.      Federal Review of State Court Decision

Petitioner raised this claim as Ground Four in his Rule 3.850 motion (*see* Doc. 13, Ex. M at 18–33).  In the written opinion denying Petitioner's claim, the post-conviction court accepted as fact Petitioner's assertion that his counsel had filed a pre-trial motion to suppress (*id*. at 41).  Based upon this fact, the state court determined that counsel was not required to object to the admission of evidence at trial that was previously the subject of a pre-trial motion to suppress in order to preserve the issue for appellate review (*id*.).

Respondent concedes that the state court record contains no indication that Petitioner's trial counsel filed a pre-trial motion to suppress (Doc. 13 at 29).  Respondent argues that this court should not "impute fault" to the state court's order because Petitioner squarely alleged in his Rule 3.850 motion that trial counsel filed a suppression motion and failed to renew it at trial (*id*.).  Respondent alternatively argues that if this court concludes that the record does not support the state court's factual determination, Petitioner's claim should be denied based upon a de novo review of his claim under Strickland (*id*. at 30).

As Respondent concedes, there is no support in the state court record for the assertion that defense counsel filed a pre-trial motion to suppress evidence; therefore, Petitioner's contention that counsel failed to preserve for appellate review an adverse ruling of the trial court on a suppression issue is unfounded.  To the extent Petitioner is arguing that his counsel should have objected at trial to admission of the lottery ticket and papers containing phone numbers on the grounds that they were illegally seized and not properly authenticated, he has failed to establish that his counsel performed unreasonably.  The trial transcript shows that Sergeant Andrews recovered a piece of paper with the name Kimberly and phone numbers on it from the area where he saw Petitioner throw something, which was within fifty feet from where Petitioner was apprehended (Doc. 13, Ex. B at 135, 138).  He also recovered a Florida lottery ticket from behind the piece of paper (*id.*).  Sergeant Andrews testified that Petitioner never left his sight during his on-foot pursuit of Petitioner, and he saw Petitioner make a downward throwing motion when he reached the open lot where he was apprehended (*id.* at 134).  Both items were admitted into evidence after Sergeant Andrews identified

them as the items recovered from the area where Petitioner threw them (*id.* at 135–36).  Lieutenant Kelly testified that after he apprehended Petitioner, he searched him and found a five-dollar bill in his pocket (*id.* at 143–44).  The five-dollar bill was admitted into evidence after Lieutenant Kelly identified it as the money he retrieved from Petitioner's pocket (*id.* at 144).  Lieutenant Kelly also identified two pieces of paper with telephone numbers written on them that he retrieved from Petitioner's pocket (*id.* at 144–45).  The victim testified that the officers placed these items on the hood of the car, and she recognized them as her personal belongings (*id.* at 110, 118).

Petitioner does not assert any factual or legal basis for his allegation that the lottery ticket and phone numbers were illegally seized, and the state court record reveals no meritorious basis for counsel to argue that the evidence was seized pursuant to an illegal detention or search.  To the contrary, the facts show that the officers had probable cause to arrest Petitioner based upon the fact that he met the general description of the attacker, he was walking at a very fast pace away from the victim's vehicle, he was just 4–5 blocks from the vehicle, he was sweating heavily, he kelp looking over his shoulder, he hid his hand behind his back when confronted by officers, and he fled on foot when the officers attempted to stop him.  Petitioner was searched after he was apprehended and handcuffed (*see* Doc. 13, Ex. B at 143, 165); therefore, there was no legal basis for challenging the search.  *See* <u>Rawlings v. Kentucky</u>, 448 U.S. 98, 111, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980) (search uncovering money in petitioner's pocket was justifiable as incident to a lawful arrest based upon probable cause); <u>United States v. Robinson</u>, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973) (search of person's pockets after arrest was lawful).  Furthermore, even if counsel had sought suppression of the items seized from Petitioner's pockets, and the court had deemed the items inadmissible, there is no reasonable probability that the jury would have acquitted Petitioner in light of the victim's testimony and identification of Petitioner as her attacker, as well as the fact that Petitioner was observed by Sergeant Andrews discarding two of the victim's items, the lottery ticket and one of the phone numbers, which were not the fruits of a search but were found in plain view.

Additionally, the evidence was properly authenticated by the officers who recovered the items from Petitioner's person and the immediate area where he was apprehended, and the items were identified by the victim as hers.  Therefore, counsel had no meritorious basis for objecting to admission of the evidence for lack of authentication or identification.  Because Petitioner has failed

to show that his trial counsel had a meritorious basis for objecting to admission of the evidence, he cannot demonstrate that counsel's failure to object constituted deficient performance, nor can he demonstrate a reasonable probability that the trial court would have excluded the evidence if counsel had challenged its admission.  Therefore, Petitioner is not entitled to federal habeas relief on this claim.

> H.    Ground eight:  Ineffective assistance of counsel based upon counsel's failure to investigate the officers' inflicting cruel and unusual punishment in violation of the Eighth Amendment.

(Doc. 7 at 5L).  Petitioner next claims that his counsel performed ineffectively by failing to investigate the fact that upon being transported to the police department, he was placed in an interrogation room, handcuffed to a chair, and deprived of food and water for four hours (*id.*). Petitioner asserts that if counsel had learned of these facts, there is a reasonable probability that the charges would have been dismissed (*id.*).

Respondent states that although Petitioner presented this ground to the state court in his Rule 3.850 motion, the state court determined that the claim was insufficiently pled (*see* Doc. 13, Ex. M at 41).  Therefore, Respondent contends, the issue is procedurally barred from federal review (*see* Doc. 13 at 34–35).  Furthermore, Respondent argues that the claim is without merit because Petitioner's counsel presented the circumstances of Petitioner's detention to the jury through Petitioner's testimony; thus, Petitioner failed to demonstrate deficient performance or prejudice (*id.* at 36–37).

Regardless of whether Petitioner fairly presented his ineffective assistance of counsel claim to the state courts, the claim is without merit.  The record demonstrates that defense counsel elicited the facts of Petitioner's detention at the police station during her direct examination of Petitioner:

> Q [by defense counsel].  So you were then taken into the police station?
>
> A [by Petitioner].  Yes, ma'am.
>
> Q.  What happened when you got down there?
>
> A.  When I got there, they put me in this interrogation room and I sat in there approximately about four hours handcuffed to a chair and without food or water. And this lieutenant, he kept coming back in there asking me did I want to give a statement and I told him I wanted to see a lawyer.  So he kept coming in and coming

in and out and in and out, until he got real angry with me and everything.  And so he
came back in again and told me he was going to put me away or something like that,
because I didn't give a statement.

> Q.  So you were held there for several hours?

> A.  Yes, ma'am.

(Doc. 13, Ex. B at 168–69).  During closing argument, defense counsel argued:

> I'm asking you to believe Mr. Paige.  He's the one who's been humiliated.  He's the
> one who suffered an injustice.
> . . . .
> Today Mr. Paige had his chance to explain to you what happened that night.
> He had the chance to tell you that he was misidentified, that he hasn't had fair
> treatment since the police first saw him.
> . . . .
> And remember Officer Kelly when he testified today?  He talked several times about
> apprehending Mr. Paige. . . . He didn't tell you he took him down with a car door and
> knocked him to the ground.  He was trying to keep that from you.  Was there
> something else he was trying to keep from you?
> . . . .
> The State makes it sound like it's a great conspiracy theory put forth by Mr.
> Paige and that's not what he said at all.  It's a mistaken, unfair identification.  And
> you've got an officer involved who is less than forthcoming about everything that
> happened that night.

(Doc. 13, Ex. C at 195, 196–97, 215).  Counsel's technique of bringing the facts of Petitioner's

treatment by police, including the manner in which he was treated at the police station, to the jury

through Petitioner's testimony and closing argument, instead of questioning the officers, was a

reasonable trial strategy, especially since there is no indication that the officers would have admitted

any mistreatment, indeed, it would be reasonable to expect that the officers would have denied any

allegations of mistreatment.

Additionally, Petitioner has failed to show a reasonable probability that the result of his trial

would have been different if counsel had questioned the officers about the circumstances of

Petitioner's detention.  None of the evidence introduced at trial was obtained by police after

Petitioner was transported to the police station, for example, there was no confession that counsel

could have argued was coerced.  Therefore, the jury would have considered the same evidence.

Furthermore, as previously discussed, the details of Petitioner's detention were presented to the jury

through Petitioner's testimony and counsel's closing argument.  Because Petitioner has failed to satisfy the <u>Strickland</u> standard, he is not entitled to habeas relief.

> I.    Ground nine:  Ineffective assistance of counsel based upon counsel's failure to object to the prosecutor's "misleading" the jury by "inferring inconsistent statements that confused [the] jury contrary to the factual truth."

(Doc. 7 at 5M–5Q).  Petitioner cites several examples of contradictions between the police officers' trial testimony and Petitioner's testimony, and he suggests that other portions of the officers' testimony were contradicted by the victim's testimony (*id*.).  Petitioner faults counsel for not "clearing up" these facts and contends that if counsel had "cleared up" this information, there is a reasonable probability that the charges would have been dismissed for lack of evidence (*id*. at 5P).

Respondent asserts that Petitioner presented this claim as Grounds Seven, Eight, Nine, and Ten of his Rule 3.850 motion (Doc. 13 at 38).  Respondent asserts that these four grounds presented the state court with confusing arguments focusing on Petitioner's perceived differences between testimonies of various witnesses, his contention that the State's witnesses committed perjury and the prosecutor misled the jury about the truth, and his argument that defense counsel should have objected.  Respondent contends that the state court discerned Petitioner's arguments as best it could and determined that defense counsel did not perform ineffectively by failing to object (*id*. at 38–39).

Rather than sort through the ten pages of confusing argument in Grounds Seven, Eight, Nine, and Ten of Petitioner's Rule 3.850 motion to determine whether Petitioner fairly presented the instant claim to the state court, the court will review the claim de novo.  Petitioner identifies four factual issues on which his testimony differed from the testimony of Sergeant Andrews and Lieutenant Kelly and contends that although defense counsel cross-examined the officers on these issues and elicited testimony from Petitioner on these issues, counsel should have made further efforts to "clear up" the factual disputes.  The four factual issues are the following:  (1) the distance between the location of the victim's vehicle and the area where Sergeant Andrews initially saw Petitioner, as well as the direction Petitioner ran when he fled, (2) the distance between the area where the lottery ticket and phone number were found on the ground and where Petitioner was apprehended, and whether the ground was wet or dry, (3) the description of the knife recovered from Petitioner's pocket, and (4) whether the windows of the patrol car from which the victim identified Petitioner were up or down (Doc. 7 at 5M–5Q).

Initially, Petitioner clearly does not understand that it is not counsel's role to resolve factual disputes in the evidence; that is the jury's role.  Additionally, a review of the trial transcript shows that counsel was not ineffective in the manner she handled the factual issues identified by Petitioner. As to the first issue, Petitioner claims that Sergeant Andrews testified he saw Petitioner at Haynes and Cross Streets, which was 4–5 blocks or less than a half mile from the location of the victim's vehicle, and that Petitioner was walking west on 9th and Cross, then ran to Haynes Street, turned and ran north for a distance of two hundred feet, and then ran west into a vacant lot.  (Doc. 7 at 5M–5N).  Petitioner states he was never on 9th Avenue, that he was on Cross Street between Haynes Street and Martin Luther King Drive, and that he ran to Haynes Street, turned right at the corner and ran into an open lot (*id*. at 5N).  Petitioner filed a map depicting the area as an exhibit to his habeas petition (*id*. at 5Q).  The trial transcript shows that Sergeant Andrews testified he first saw Petitioner walking westward on Cross Street between Alcaniz[7] and Haynes (*see* Doc. 13, Ex. B at 131–32). This is consistent with Petitioner's testimony.  Although the prosecutor later asked Andrews, "Now, the direction that you saw him walking, would that have been west on 9th and Cross?" and Andrews responded, "Yes," it was obvious that Andrews was referring to the intersection of 9th and Cross from which Petitioner was walking westward.  Additionally, Sergeant Andrews' estimation of 4–5 blocks or less than a half mile as the distance between the intersection of 9th and Cross and where he saw Petitioner was not significantly different from Petitioner's estimation of 5–6 blocks according to Petitioner's map.  Furthermore, according to Petitioner, his map, and Sergeant Andrews, Petitioner ran to Haynes and turned north (right) and then ran to a vacant lot west of Haynes.  The differences in Petitioner's version of the facts and Sergeant Andrew's testimony was so insignificant that it was not unreasonable for counsel to nit-pick this difference on cross-examination of Sergeant Andrews or mention it in closing argument.

As to the second factual issue, Petitioner states Sergeant Andrews testified he found the lottery ticket and a phone number within 50 feet from where Petitioner was apprehended.  Petitioner acknowledges that defense counsel asked Andrews, "You can't say for absolute sure you went back to the exact same spot [that Andrews saw Petitioner make a downward throwing motion], can you?"

---

[7]Lieutenant Kelly testified that Alcaniz Street was subsequently renamed Martin Luther King Boulevand (*see* Doc. 13, Ex. B at 140)

and Andrews responded, "The exact spot Petitioner was standing?  No" (Doc. 7 at 5N).  Petitioner has failed to show that defense counsel's cross-examination on this point was inadequate since she was able to elicit an admission from Andrews that he could not be sure he recovered the items from the same spot he saw Petitioner throw something.  Petitioner also faults counsel for failing to "clear up" the fact that Sergeant Andrews testified he knew the items were recently placed on the ground because the items were dry but the ground was wet, but Petitioner testified that the ground was dry (*id*. at 5N–5O).  The fact that counsel elicited testimony from Petitioner that contracted Andrews' testimony was reasonable trial strategy.  As discussed *supra*, it was not counsel's role to resolve the factual dispute; she could only present Petitioner's version of the facts, which she did, and argue during her closing that Petitioner's version was more credible, which she did.  Again Petitioner has failed to demonstrate deficient performance.

The third factual dispute involved the description of the knife recovered from Petitioner's pocket.  The victim testified that the knife used by her attacker was a yellow "Exacto" knife, similar to a box cutter (Doc. 13, Ex. B at 111).  Defense counsel elicited a more detailed description from the victim, including that the knife was essentially a razor blade held in a metal handle (*id*. at 115).  Petitioner states defense counsel asked Lieutenant Kelly to describe the knife he found in Petitioner's pocket, and Kelly testified it was a Swiss Army knife with a red handle (*see* Doc. 7 at 5O; Doc. 13, Ex. B at 147).  Defense counsel asked Kelly if the knife had several blades, a corkscrew, and the like, and Kelly responded in the affirmative (*id*.).  Additionally, defense counsel elicited an admission from Lieutenant Kelly that the victim stated that Petitioner's knife was not the same one she had seen her attacker use (Doc. 13, Ex. B at 148).  Defense counsel elicited testimony from Petitioner that his knife was a small, single blade knife with a red handle (Doc. 13, Ex. B at 171).  During closing argument, defense counsel highlighted the difference in the victim's description of the knife and the knife found in Petitioner's pocket (*id*. at 194, 212).  Contrary to Petitioner's assertion, defense counsel effectively presented to the jury the fact that Petitioner's knife was very different than the knife described by the victim.  Defense counsel could do nothing more to "clear up" this issue for the jury.

Finally, Petitioner asserts that defense counsel asked Lieutenant Kelly whether the windows of the patrol car where the victim was sitting were up or down when she identified Petitioner, and

Kelly stated that the windows were down (*see* Doc. 13, Ex. B at 148).  Defense counsel elicited testimony from Petitioner that the windows were up and argued during her closing that the fact that the windows were up inhibited an accurate identification (*id*. at 165–66, 214).  Petitioner appears to fault counsel for not asking the victim about the position of the windows (*see* Doc. 7 at 5O–5P).  The court concludes that defense counsel treated this factual issue in a very effective manner.  By questioning Lieutenant Kelly and Petitioner about this issue, counsel created a factual dispute that called into question the accuracy of the victim's identification of Petitioner, and misidentification was the crux of the defense.  Counsel did not perform deficiently in her treatment of this issue; therefore, Petitioner is not entitled to relief.

For the aforementioned reasons, it is respectfully **RECOMMENDED**:

That the amended petition for writ of habeas corpus (Doc. 7) be **DENIED**.

At Pensacola, Florida, this 26th day of September 2007.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**